**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| JEREMY BURKETT, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>GENERAL MOTORS COMPANY; and GENERAL MOTORS, LLC, INC,<br><br>            *Defendants*, | Case No.: 4:25-cv-00584<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Jeremy Burkett, individually and on behalf of all those similarly situated, complain of Defendants General Motors Company and General Motors, LLC (collectively referred to as "GM" or "Defendants") based upon his personal knowledge as to facts specific to them and based upon the investigation of counsel in all other respects, as follows:

**I.      NATURE OF THE ACTION**

*"Motor vehicles are the primary mode of transportation for most of us, and often an indispensable part of our lives. But what would happen if your vehicle suddenly disappeared?"[1]*

1.      Over fifty years ago, the U.S. Department of Transportation ("DOT") recognized that "stolen cars constitute a major hazard to life and limb… [and] cause unreasonable risk of accident, personal injury, and death[.]" 33 Fed. Reg. 6,471 (Apr. 27, 1968). In recognition of the safety risk caused by auto thefts, Federal Motor Vehicle Safety Standards ("FMVSS" or "Safety Standards") were promulgated. The National Highway Traffic Safety Administration ("NHTSA")

---

[1] https://www.nhtsa.gov/road-safety/vehicle-theft-prevention  (last accessed June 1, 2025).

concluded that, "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety." *Id.*

2.      One of the most fundamental Safety Standards is FMVSS No. 114, titled "Theft Protection and rollaway prevention," which requires manufacturers to install in each of their vehicles "a starting system which, whenever the key is removed from the starting system prevents: (a) The normal activation of the vehicle's engine or motor; and (b) Either steering, or forward self–mobility, of the vehicle, or both." 49 C.F.R. § 571.114 S5.1.1.

3.      This action concerns a material safety defect in tens of thousands of Chevrolet, GMC, and Cadillac SUV's and Trucks manufactured by GM from 2010 to the present that utilize keyless entry to lock, unlock, and/or start the vehicle (the "Class Vehicles"), all of which have a hackable key fob system (the "Theft Prone Defect" or "Defect"). Plaintiff brings this action individually and on behalf of National Class, for the benefit and protection of owners and lessees of the following model years from 2010 to the present (collectively, the "Vehicles" or "Class Vehicles"):

- Chevrolet Tahoe
- Chevrolet Suburban
- Chevrolet Silverado
- GMC Yukon
- GMC Yukon XL
- GMC Sierra
- Cadillac Escalade
- Cadillac Escalade ESV

4.      Some key fobs or "smart keys" use nonsecure commercial radio waves that communicate to the vehicle when the fob is near or inside of it. These radio waves enable keyless entry utilizing a key fob or smart key for unlocking and locking the vehicle doors and in some cases, starting the ignition.

5.      The Class Vehicles have been, and still are, being targeted due to the Defect, which allows these Class Vehicles, that utilize keyless entry, to be easily unlocked and stolen without the car's security alarm being set off.

6.      The signal between the key fob and the car's computer can be easily intercepted by a nearby electronic device, which records and then replays the signal, tricking the car into believing the genuine key fob is in close proximity.

7.      Consequently, within a matter of 20-30 seconds, the intercepted signal can be utilized to unlock the car and start the ignition.

8.      The Class Vehicles also contain a defective OBDII port that, in addition to the hackable key fob system, makes these cars a favorite of thieves across the country who can steal the car in under a few minutes. Thieves can easily access the OBDII port and connect a handheld device purchased online to tap into the car's computer system, program a new key fob, and drive off.

9.      This key replication technique has led to an influx of tutorial videos and tips across the internet that provide easy to follow directions on how to successfully utilize this method to steal cars such as the Class Vehicles.

10.     Upon information and belief, GM has long known about these Defects and/or at a minimum the inherent risks associated with utilizing a keyless entry system capable of being intercepted.

11.     In 2024, the Chevrolet Silverado 1500 is the most stolen vehicle with just under 6,500 stolen in Texas, with the GMC Sierra 1500 ranked second in thefts with a little more than 4,000 thefts.[2]

---

[2] https://www.kxan.com/news/these-are-the-most-common-cars-being-stolen-in-texas/ (last accessed June 1, 2025).

12.     Police believe thieves have started using key clone devices to steal new models. The devices are about the size of cell phones.[3] They are capable of picking up the signal of a nearby key fob and cloning it, giving thieves access to the car.

13.     Despite warnings issued by police in many municipalities, upon information and belief, GM has taken no action to prevent or rectify the harm done to consumers.

14.     After heavy public scrutiny by customers, media, and politicians, GM has acknowledged that the Class Vehicles are highly prone to theft, yet they have failed to admit that they suffer from the Theft Prone Defect, issue a safety recall, provide warranty coverage, or offer a complete remedy for the Theft Prone Defect in the Class Vehicles.

15.     For most Americans, the purchase or lease of a motor vehicle is their second largest financial transaction, following only the purchase or lease of a home. Had Plaintiff and other Class Members known of the Theft Prone Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them.

16.     As a result of GM's unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff and members of the Classes, have suffered an ascertainable loss of money and/or property in the form of, for example, loss of value, loss of use of the vehicles, repair costs, insurance deductible costs, higher insurance premiums, lost time, and other inconvenience and anguish.

17.     Accordingly, Plaintiff brings this action to redress GM's misconduct. Plaintiff seeks equitable relief in the form of an adequate remedy for the Theft Prone Defect, an appropriate curative notice regarding the existence the Theft Prone Defect, recovery of damages, a repair under state consumer-protection statutes and implied warranties, and reimbursement of all expenses

---

[3] https://www.youtube.com/watch?v=1cKR7C9GX48 (last accessed June 1, 2025).

associated with the repair or replacement of the Class Vehicle and damage caused by the Theft Prone Defect.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because GM transacts substantial business in this district. GM advertised in this district and GM received substantial revenue and profits from sales and/or leases of the Class Vehicles in this district. GM also has research and development offices in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

20.     This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District. Plaintiff Jeremy Burkett purchased his Class Vehicle in this District. GM has marketed, advertised, sold, and leased Class Vehicles within this District.

## III.     PARTIES

### A.     Plaintiff Jeremy Burkett

21.     Plaintiff Jeremy Burkett ("Plaintiff," for purposes of this section) is a resident of Dallas County, Texas. On or about April 20, 2017, Plaintiff purchased a used 2016 GMC Sierra

1500 (VIN#3GTP1NEC2GG364910). Plaintiff's 2016 GMC Sierra 1500 had a traditional "insert-and-turn" steel key ignition system but had a keyless entry system. Plaintiff was provided two keyless entry remotes at the time of purchase. On information and belief, Plaintiff's 2016 GMC Sierra 1500 is a Class Vehicle subject to the Theft Prone Defect. During the early morning hours of November 9, 2022, Plaintiff's 2016 GMC Sierra 1500 was stolen from his residential driveway. Once the theft was discovered, Plaintiff filed a police report and insurance claim.

22.    Upon information and belief, an unknown thief was able to hold up a device to Plaintiff Burkett's front door (close to where his keys were typically stored) to transmit the key fob's signal to a cloning device, which was subsequently used to trick the Plaintiff Burkett's car into thinking the authentic key fob was nearby. This resulted in the unknown thief being able to gain entry and start Plaintiff Burkett's 2016 GMC Sierra 1500, without detection.

23.    Indeed, the individual(s) who stole Plaintiff Burkett's 2016 GMC Sierra 1500 gained access without breaking any windows or setting off the alarm system.

24.    Plaintiff Burkett never recovered his 2016 GMC Sierra 1500.

25.    Plaintiff experienced inconvenience and emotional distress related to the Theft Prone Defect. The theft occurred approximately three days after his wedding on November 6, 2022, and one day before his wife began chemotherapy for breast cancer. Plaintiff was forced to borrow his wife's vehicle for work when not used for medical appointments. However, Plaintiff constantly worried about what would happen if his wife had a medical emergency while Plaintiff was at work with the only household vehicle.

26.    Although Plaintiff was compensated by his insurance company for the total loss, the sharp increase in car prices meant that he could afford less with the compensation he received. Prior to the Theft Prone Defect, Plaintiff had a nearly paid for, ostensibly luxury vehicle. Now,

because of the Theft Prone Defect, he has a car payment on a vehicle he would not have otherwise chosen to purchase. All of this also caused unnecessary financial stress.

27.     On or around May 3, 2023, Plaintiff purchased a new 2023 GMC Sierra 1500 (VIN#3GTUUGED3PG260912) from McKinney Buick GMC located in Collin County, Texas. Plaintiff's vehicle has a push start ignition system with keyless entry. On information and belief, Plaintiff's 2023 GMC Sierra 1500 is a Class Vehicle subject to the Theft Prone Defect.

28.     On information and belief, McKinney Buick GMC Dealership is part of GM's network of authorized dealers across the United States and is promoted on GM's website, which includes an updated list of the dealership's inventory.

29.     Plaintiff Burkett purchased his Class Vehicle(s) because he believed that the vehicle was safe, reliable, and high quality. Before purchasing the Class Vehicle, Plaintiff Burkett reviewed and relied on numerous statements and representations about it.

30.     Plaintiff visited the GM website and reviewed representations about the Class Vehicle's safety, reliability, and quality.

31.     Because Defendants failed to disclose the Theft Prone Defect, Plaintiff's research did not uncover that the Class Vehicle(s) was affected by the Theft Prone Defect, and instead GM touted the Class Vehicle's safety, reliability, and quality.

32.     Plaintiff saw GM television commercials that touted, among other things, the safety, reliability, and quality of GM branded vehicles.

33.     After he purchased his new Class Vehicle, Plaintiff Burkett learned that his new 2023 GMC Sierra 1500 was susceptible to Theft Prone Defect.[4]

---

[4]https://www.nbcdfw.com/news/local/plano-police-help-crack-auto-theft-ring-discovered-2-5-mil-of-trucks-stolen-in-a-month/3277925/ (last accessed June 1, 2025).

34.     Even today with his new vehicle, Plaintiff constantly worries about theft. He wonders every time he parks if it is a safe place or if he should look for some place safer. He does not feel comfortable keeping a USB cord in his new vehicle. Finally, when his car was stolen things were missing that had his address on it. This caused him stress and anxiety as he does not know who might have his address, and he worries if he is safe at home now.

35.     Plaintiff purchased the Class Vehicle(s) primarily for personal, family, and household purposes in that this was not purchased on behalf of a business and was not titled in a business' name. It was Plaintiff's only vehicle and he used it for all his personal, family, and household transportation needs such as household errands. Because it was Plaintiff's only vehicle and Plaintiff used it for personal purposes, he purchased it with personal funds and kept it at his residence.

36.     At no point before Plaintiff purchased his Class Vehicle(s) did GM disclose that it suffered from the Theft Prone Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

37.     Indeed, GM concealed the existence of the Theft Prone Defect from consumers like Plaintiff. Had they disclosed the Theft Prone Defect before Plaintiff acquired the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at (GM Dealership).

38.     Plaintiff suffered an ascertainable loss as a result of Defendants' wrongful conduct associated with the Theft Prone Defect.

39.     Plaintiff did not receive the benefit of his bargain. Plaintiff purchased vehicle(s) that are of a lesser standard, grade, and quality than represented, and he did not receive a vehicle

that met ordinary and reasonable consumer expectations regarding quality design, and safe and reliable operation. The Theft Prone Defect has significantly diminished the value of Plaintiff's Class Vehicle(s).

40.    Had Defendants disclosed the Theft Prone Defect, Plaintiff would not have purchased his Class Vehicle(s), or would have paid less to do so.

**B.    Defendants**

41.    Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. General Motors LLC is registered to do business in the State of Delaware. The sole member and owner of General Motors LLC is General Motors Holdings LLC.

42.    General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motor Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

43.    General Motors LLC, through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Delaware. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

44.    At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

45.    In order to sell vehicles to the general public, GM enters into agreements with dealerships who are then authorized to sell GM-branded vehicles such as the Class Vehicles to consumers such as Plaintiff. These agreements also designate the authorized dealerships to conduct warranty and recall repairs on GM's behalf. All service and repairs performed at an authorized dealership are also completed according to GM's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), preliminary information bulletins ("PIs"), information service bulletins, and other documents, often only referred to by a "Document ID." Per the agreements between GM and the authorized dealers, consumers such as Plaintiff can receive services under GM's issued warranties at dealer locations that are convenient to them. Furthermore, GM's authorized dealerships are only able to sell new vehicles purchased directly from GM, as well as parts for those vehicles to be used in service and repairs. As such, GM directly profits from all sales of new vehicles at authorized GM dealerships and directly profits from all sales of parts at those dealerships. GM also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. GM is also responsible for the production and content of the information on the Monroney Stickers, as well as other window stickers.

46.    GM is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor GM. Consumers are not given a meaningful choice in the terms of the warranties provided by GM, and those warranties are offered on a "take it or leave it" basis.

## IV.    FACTUAL ALLEGATIONS

### A.    GM Became One of the Most Popular Automakers in the United States By Promoting the Safety, Quality, and Reliability of Their Vehicles

47.    Since at least 2010, GM has designed, manufactured, distributed, sold, and leased the Class Vehicles. GM has sold and leased, directly or indirectly, through dealers and other retail

outlets, thousands of Class Vehicles in Michigan and nationwide. In 2019, GM sold 2,547,000 vehicles in the United States alone and estimated that it was "the market share leader in North America[.]"[5]

48.      GM has thousands of authorized dealerships across the United States. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts.[6] Its net automotive sales through those dealerships, for its North American region, totaled $96.733 billion in 2020.[7] GM sells its vehicles to its authorized dealerships, which in turn sell those vehicles to consumers. After these dealerships sell cars to consumers, including the Plaintiff and Class Members, they purchase additional vehicle inventory from GM to replace the vehicles sold, increasing GM's revenues. Thus, Plaintiff and Class Members' purchase of Class Vehicles accrues to the benefit of GM by increasing its revenues. In addition, GM underscores the importance of its dealerships as follows: "The quality of GM dealerships and our relationship with our dealers and distributors are critical to our success given that dealers maintain the primary sales and service interface with the end consumer of our products.[8]

49.      Chevrolet, GMC, and Cadillac branded vehicles share many of the same components and the same group of engineers work on Chevrolet, GMC, and Cadillac vehicles at GM.

50.      Chevrolet, GMC, and Cadillac vehicles are also frequently rebranded or "rebadged" versions of the same vehicles. For example, the GMC Yukon vs. Chevrolet Tahoe

---

[5] General Motors Company 2020 Annual Report (Form 10-K), at 2 (Feb. 5, 2020), available at: https://investor.gm.com/static-files/78f06039-f442-41a0-8929-81021e9ccb17 (last visited June 1, 2025).
[6] *Id*. at 3.
[7] *Id*. at 30.
[8] Id. at 3.

"share a platform, a standard 5.3-liter V-8 with 355 horsepower and 383 pound-feet of torque, and a 10-speed automatic transmission."[9] The engines are the same in these vehicles, the climate controls are placed in the same locations, even the number of cupholders (14) are identical.

51.    Because Chevrolet, GMC, and Cadillac vehicles are often rebadged vehicles, they frequently use identical and interchangeable parts. That is why when Chevrolet announces a recall of its vehicles, an identical GMC recall is typically announced shortly thereafter, or vice versa.

**B.    Background on Keyless Entry**

52.    Plaintiff is further informed and believe that the Class Vehicles, as defined herein, each contain keyless car technology that is susceptible to being hacked. Thus, all Class Vehicles suffer from this same Defect.

53.    Keyless car technology works by transmitting low-frequency singles between a keyless electronic fob and the vehicle's computer.[10]

54.    The signal allows the car to unlock and the engine to start when the signal from the key fob is in close proximity.[11]

55.    Keyless car theft, also called "relay car theft," is when an individual hacks into the car's signal through its corresponding key fob.[12]

56.    The key fob's unique code is transmitted into the cloning device and subsequently used to deceive the car into thinking the authentic key fob is nearby.[13] Then, because the vehicle

---

[9] https://www.gmcfortwaltonbeach.com/gmc-yukon-vs-chevy-tahoe-comparison/#:~:text=Chevy%20Tahoe:%20Specs%20&%20Performance,City/Highway/Combined (last accessed June 1, 2025).

[10] https://www.progressive.com/answers/keyless-ignition-cars/ (last accessed June 1, 2025).

[11] Id.

[12] See  https://www.nbclosangeles.com/news/local/chevy-camara-car-thefts-keyfob-clones-lapd/3352959/ (last accessed June 1, 2025).).

[13] https://www.locksmiths.co.uk/faq/keyless-car-theft/ (last accessed June 1, 2025).

thinks the authentic key is near, the vehicle unlocks, and the engine can be started, all without the car's alarm going off.

57.    Interception devices are readily available for purchase at relatively low costs on platforms such as Amazon, eBay and other online stores.[14] These devices may be as compact as the average smart phone.[15]

58.    The key fob, and its code, are an essential component of the Class Vehicles as these are the primary means of access and operation of the car. Intercepting the code grants hackers the ability to gain access into the vehicle, start the engine, and drive away without activating the alarm.

59.    Upon information and belief, Defendant has known of this Defect and failed to prioritize advancing the security of the Class Vehicles.

60.    Other automobile manufactures, like Jaguar and Range Rover, have developed ultra-wide band protection to counter relay car theft, while Defendant has remained silent and failed to act or even notify the public of the safety risks.

**C.    The Hackable Key Fobs in Defendant's Vehicles Has Led to Thefts and Car Break-Ins**

61.    Upon information and belief, every Class Vehicle sold between 2010 to 2023 that utilizes keyless entry technology were designed with hackable key fob technology.

62.    For instance, the online user manual for the 2023 GMC Sierra 1500 notes the car comes standardly equipped with "Keyless Access system", which "allows for doors and the

---

[14] https://leasing.com/guides/relay-car-theft-what-is-it-and-how-can-you-avoid-it/. (last accessed June 1, 2025).
[15] https://www.nbclosangeles.com/news/local/chevy-camara-car-thefts-key-fobclones-lapd/3352959/  (last accessed April 3, 2024).

tailgate to be accessed without pressing the remote key button."[16] "The remote key functions may work up to 60 m (197 ft) away from the vehicle."

63.    According to Chevrolet.com, the Keyless Open and Keyless Start can "lock and unlock doors, access the liftgate or trunk, and start your vehicle without removing your key fob from your pocket or bag, as long as it's within range."[17]

64.     "When you approach the vehicle with the key fob within a three-foot range of the door, pressing the button on the driver's door handle once will unlock the driver's door; pressing it again within five seconds will unlock all doors."[18]

65.    Consumers can also download an application to their smartphone that allows them to "remote[ly] start, unlock and lock [the] vehicle, view [the] fuel life and tire pressure, and more . . ."[19]

66.    Similarly, the Owner's Manual for the Class Vehicles also includes information on Remote Keyless Entry as well as Remote Vehicle Start.

67.    Upon information and belief, Class Vehicles from 2010 to the present all have some form of keyless entry capabilities.

68.    Due to the Defect in Class Vehicles, along with other vehicles containing the same defect, social media trends contributed to a significant increase of car thefts across the county. These trends highlight how easy it is to steal keyless entry vehicles, exasperating the threat Class Vehicle owners face.

---

[16] https://cdn.dealereprocess.org/cdn/servicemanuals/gmc/2023-sierra1500.pdf (last accessed June 1, 2025).
[17] https://www.chevrolet.com/support/vehicle/security/keyless-open-start  (last accessed June 1, 2025).
[18] *Id*.
[19] https://www.chevrolet.com/support/vehicle/smartphone-connections/mychevrolet-mobile-app/instructions#:~:text=Getting%20started,process%20to%20verify%20your%20identity.(last accessed June 1, 2025).

**D.**    **For Over Fifty Years, Auto Thefts Have Been Known to Pose a Serious Safety Risk**

69.    It is well-established that auto thefts pose a serious safety risk to vehicle owners

and bystanders. In 1966, Congress enacted the National Traffic and Motor Vehicle Safety Act (the

"Safety Act"), 49 U.S.C. § 30101 *et seq.*, "to reduce traffic accidents and deaths and injuries

resulting from traffic accidents" and to prescribe motor vehicle safety standards."

70.    In 1968, the DOT promulgated a new Safety Standard No. 114 titled "Theft

Protection; Passenger Cars," pursuant to the Safety Act. *See* 33 Fed. Reg. 6,471 (Apr. 27, 1968).

71.    FMVSS No. 114 implemented after it was "demonstrated that ***stolen cars***

***constitute a major hazard to life and limb on the highways.***" *Id.* (emphasis added). As part of its

evaluation of FMVSS No. 114, the DOT found that "[t]he evidence shows that cars operated by

unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury,

and death than those which are driven by authorized individuals." *Id*.

72.    Among the evidence used in support of this conclusion was a 1968 study

conducted by the ("DOJ"). The DOJ found that a substantially significant number of stolen

vehicles would result in personal injury accidents:

> [T]here were an estimated 94,000 stolen cars involved in accidents in 1966, and
> more than 18,000 of these accidents resulted in injury to one or more people. On a
> proportionate basis, 18.2 percent of the stolen cars became involved in accidents,
> and 19.6 percent of the stolen-car accidents resulted in personal injury. The same
> study predicted that automobile thefts in 1967 total about 650,000; about 100,000
> of these stolen cars could be expected to become involved in highway accidents.
> ***Comparing these figures with statistics for vehicles which are not stolen, the***
> ***approximate rate for stolen cars would be some 200 times the normal accident***
> ***rate for other vehicles***.

73.    The DOJ survey found that "[t]he number of car thieves who start cars with so-

called 'master keys' and devices which bypass the lock is … large enough to produce a significant

safety hazard." *Id*. Accordingly, FMVSS No. 114 was explicitly designed to "defeat" this method

for stealing a vehicle and requires "[a] large number of locking-system combinations and a steering or self-mobility lock." *Id.*

74.     When promulgating FMVSS No. 114, the DOT rejected several comments in opposition to the Standard that argued that "since any locking system, no matter how it is constructed, can be defeated by persons possessing sufficient skill, equipment, and tenacity, provisions for ensuring removal of ignition keys would be futile because a thief need no make use of a key." *Id*. In particular, the DOT relied on the DOJ study which found that "the large majority of car thieves are amateurs, almost half of whom are engaged in so-called 'joy-riding'" and that "most" of the thieves are juveniles. *Id*. This finding would be shown to be a prescient warning to automobile manufacturers and just as relevant fifty years later.

75.     Given the dramatic increased in the accident rate caused by stolen vehicles, the DOT determined that **"*a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety*. It would not only reduce the number of injuries and deaths among those who steal cars, it would also protect the many innocent member of the public who are killed and injured by stolen cars each year." *Id*. (emphasis add). Further, the DOT "concluded that a standard that would reduce the incidence of unauthorized use of cars meets the need for motor vehicle safety" and rejected the contention that the Theft Protection rules are "not related to improving motor vehicle safety." *Id*.

76.     The first iteration of FMVSS No. 114, Theft Protection; Passenger Cars, stated in relevant part:

S1. *Purpose and scope*. This standard specifies requirements for theft protection to reduce the incidence of accidents resulting from unauthorized use.

S2. *Application*. This standard applies to passenger cars.

S4. *Requirements*.

**S4.1 Each passenger car shall have a key-locking system that, whenever the key is removed, will prevent-**
> **(a) Normal activation of the car's engine or other main source of motive power; and**
> **(b) Either steering or self-mobility of the car, or both.**

S4.2 The prime means for deactivating the car's engine or other main source of motive power shall not activate the deterrent required by S4.1(b).

S4.3 The number of different combinations of the key locking systems required by S4.1 of each manufacturer shall be at least 1,000, or a number equal to the number of passenger cars manufactured by such manufacturer, whichever is less.

S4.4 A warning to the driver shall be activated when the key required by S4.1 has been left in the locking system and the driver's door is opened.

*Id*. The standard became effective on January 1, 1970. *See id*.

77.     In the half century since the DOT recognized the safety risks posed by auto thefts, the agency has continued to monitor the safety risks posed by auto thefts and modernize its rules designed to prevent auto thefts.

78.     In 1984, Congress enacted the Motor Vehicle Theft Law Enforcement Act {the "Theft Act"), 49 U.S.C. 33101, *et seq*., which directs the NHTSA to establish theft prevention standards for passenger vehicles. See 81 Fed. Reg. 66,833 66,834 (Sept. 29, 2016). Pursuant to the Theft Act, NHTSA implemented 49 C.F.R. Part 541, which requires manufacturers of designated high theft passenger car lines to inscribe or affix the Vehicle Identification Number (VIN) onto the engine, the transmission, and major body parts. Each vehicle line is granted an exemption from the parts marking requirements ("PMR"). A manufacturer may petition for a PMR exemption when it plans to install a standard equipment antitheft device on the entire line. *See* 49 C.F.R. §§ 543.1, *et seq*. The agency must determine that the antitheft device to be installed on the line is likely to be as effective in reducing and deterring motor vehicle theft as parts-marking.

79.     In 1992, Congress enacted the Anti Car Theft Act (Pub. L. No. 102-519, codified at 49 U.S.C. chapter 331), which expanded the PMR to include multipurpose passenger vehicles and certain light duty trucks. On April 6, 2004, the Federal Motor Vehicle Theft Prevention Standard was extended to include all passenger cars, multipurpose passenger vehicles with a gross vehicle weight rating (GVWR) of 6,000 pounds or less, all light-duty trucks (LDTs) determined to be high-theft (with a gross vehicle weight rating of 6,000 pounds or less), and all low-theft LDTs with major parts that are interchangeable with a majority of the covered major parts of those passenger motor vehicle lines subject to the theft prevention standard. 69 Fed. Reg. 17,960 (Apr. 6, 2004).

80.     In 2006, NHTSA iterated that its "safety standard on theft protection [FMVSS No. 114] specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles." *See* 71 Fed. Reg. 17,752 (Apr. 7, 2006) NHTSA goes on to make clear that "the standard sought to ensure that the vehicle could not be easily operated with the key" and that "thieves… could [not] bypass the ignition lock." *Id*. At 17,752-53.

81.     FMVSS No. 114 is currently codified as 49 C.F.R. 571.114, which provides:

**S1. Scope**. This standard specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles.

**S2. Purpose**. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.

**S3. Application**. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with a GVWR of 4,536 kilograms (10,000 pounds) or less. However, it does not apply to walk- in van-type vehicles. Additionally, paragraph S5.3 of this standard applies to all motor vehicles, except trailers and motorcycles, with a GVWR of 4,536 kilograms (10,000 pounds) or less.

**S4. Definitions**.

*Combination* means a variation of the key that permits the starting system of a particular vehicle to be operated.

*Key* means a physical device or an electronic code which, when inserte4d into the starting system (by physical or electronic means), enables the vehicle operator to activate the engine or motor.
…
*Starting system* means the vehicle system used in conjunction with the key to activate the vehicle operator to activate the engine or motor.
…
*Starting system* means the vehicle system used in conjunction with the key to activate the engine or motor.

**S5 Requirements**. Each vehicle subject to this standard must meet the requirements of S5.1, S5.2, and S5.3. Open-body type vehicles are not required to comply with S5.1.3.

S5.1 **Theft protection**.

S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
(a) The normal activation of the vehicle's engine or motor; and
(b) Either steering, or forward self-mobility, of the vehicle, or both.

82.    FMVSS No. 114 is a "self-certification" process.[20] In other words, "NHTSA does not issue type approval certification and does not certify any motor vehicles or motor vehicle equipment as complying with applicable FMVSS."

83.    NHTSA is also required to periodically obtain and publish accurate4 and reliable theft data. 49 U.S.C. 33104(b)(4) (Designation of high theft vehicle lines and parts). The National Crime Information Center ("NCIC") of the Federal Bureau of Investigation provides this date to NHTSA. The NCIC is a governmental system that receives vehicle theft data from approximately 23,000 criminal justice agencies and other law enforcement authorities throughout the United States. This national data includes the reported thefts of self-insured and uninsured vehicles, not all of which are reported to other data sources.

---

[20]https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/used-cars-new-platforms-accelerating-sales-in-a-digitally-disrupted-market#  (last accessed June 1, 2025).

84.     In connection with fulfilling its administrative mandate under both the Safety Act and the Theft Act, NHTSA regularly interacts with, seeks comment from, and shares information with, automative manufacturers and their authorized representatives, including GM.

85.     GM also affix to each Class Vehicle a label or tag certifying that the vehicle "complies with applicable motor vehicle safety standards" and "this vehicle conforms to all applicable U.S.A. federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture…"

**E.     GM Fails to Address the Defect**

86.     Upon information and belief, GM knew (or at the very least should know) of the Defect in the Class Vehicles yet has failed to disclose the Defect to consumers.

87.     Plaintiff is further informed and believe that GM concealed and/or otherwise failed to disclose, reveal, or provide notice to customers, including Plaintiff and Class Members, in Defendant's advertising, labeling or otherwise that the Class Vehicles were, and still are, defective and are not fit for the ordinary purposes for which the vehicles are used in that they are easy to steal, unsafe, and worth less than they should be, if they were not defective.

88.     Rather than address the Defect, GM has remained silent on the issue while thefts continue to soar.

**F.     GM's Misconduct Injured Plaintiff and the Class**

89.     Plaintiff and the Class purchased Class vehicles manufactured and distributed by GM.

90.     Upon information and belief, car thieves are able to use a cloning device close to the location of Plaintiff's keys to transmit the key fob's signal to a cloning device, which was subsequently used to trick the Class Vehicles car into thinking the authentic key fob was nearby.

This resulted in unknown thieves being able to gain entry and start Plaintiff's Class Vehicle without detection.

91.     Indeed, the individual(s) who stole Plaintiff's Class Vehicle were able to break into them without setting off its alarm system.

92.     Unbeknownst to Plaintiff at the time of their purchase of his Class Vehicles, they suffered an economic injury due to the Defect (that was concealed at the time of purchase) in the Class Vehicles.

93.     As would a typical consumer, Plaintiff reasonably believed upon purchase that the Class Vehicle's security system (including the accompanying key fob and keyless entry system) would be fit for the ordinary purpose for which its security system was used, i.e., protecting the vehicle, and whatever was inside of it, from theft.

94.     The hackable key fob system on Plaintiff's Class Vehicles compromises the security of the vehicle, poses safety risks and other inconveniences as described above, and otherwise impairs the utility and value of the vehicle.

95.     Consequently, if ordinary reasonable consumers had known of the Theft Prone Defect, they naturally would consider it an important and material fact in deciding whether to purchase or lease a Class Vehicle and/or how much to pay for it.

96.     As a long-time automotive manufacturer, which has likely conducted numerous customer surveys and fielded thousands of complaints and warranty claims from consumers, GM was aware that ordinary reasonable consumers generally expect defect-free automobiles when they make a substantial investment to purchase or lease.

97.     GM could and should have informed Plaintiff and the Class of the Theft Prone Defect, rather than concealing it and/or failing to warn consumers about the risk of theft. Such

information could have been provided through advertising and marketing campaigns; on-vehicle labeling, stickers, and placards; owner manuals; brochures; pamphlets; dealership personnel and agents; the internet and social media outreach; and through full and complete disclosure through recalls.

98.    Such information could easily have been made known to Plaintiff and the Class by GM before Plaintiff and the Class purchased their Class Vehicles, such as through their interactions with GM's dealership personnel and agents; all the various marketing and advertising GM undertake (including through television, internet, social media, sporting events, and other media); by looking at their vehicles, upon which GM could have affixed a warning about the Defect which Plaintiff would have necessarily seen by looking and sitting in the vehicle itself; and/or through the mail or email, as GM could have sent out—and indeed, regularly do send out— for the many recalls GM routinely issues each year.

99.    Despite having knowledge of the Defect as detailed above—knowledge far superior to that of ordinary consumers such as Plaintiff and the Class— GM remained silent about the Defect for the Class Vehicles. As a result, the public— including prospective purchasers and lessors like Plaintiff and the Class—were unaware of the Defect at the time they purchased their Class Vehicles.

100.    GM intended to mislead, and in fact misled, ordinary reasonable consumers— including Plaintiff and the Class—through its omissions, active concealment and/or failure to warn of the Defect. GM did so with the intent to generate and increase sales of the Class Vehicles, thereby increasing its share of the automobile market and avoiding the expense of reprograming the key fob security systems.

101.    The Class Vehicles have a diminished value compared to the price they commanded when purchased or leased by Plaintiff and the Class because disclosure of the Defect would influence the purchasing and leasing decisions of ordinary reasonable consumers, including their valuation and willingness to pay for the Class Vehicles.[21]

102.    For over ten years, GM's conduct has placed a target on the vehicles of Plaintiff and the other Class Members because a thief can easily identify a Class Vehicle, such as a GMC Yukon, Chevrolet Tahoe, or GMC Sierra, uplock it and steal it (which is exactly what happened to Plaintiff).

103.    If an individual is lucky enough to retrieve their vehicle after it is stolen due to the Defect, costs for repair can cost thousands of dollars. Not to mention increased insurance costs and the costs associated with finding alternative transportation.

104.    Plaintiff and the Class lost money as a result of GM's conduct because they did not receive what they reasonably believed they were paying for due to GM's omission, active concealment, and/or failure to warn of the Defect, while Defendant realized a commensurate unearned gain because it did not deliver to Plaintiff and the Class what it reasonably expected to receive in exchange for the money it paid.

105.    As a result of GM's misconduct, Plaintiff and the Class suffered economic injury at the time of purchasing or leasing their Class Vehicles. Particularly, either they purchased or leased vehicles that they otherwise would not have, or they paid more to own or lease their Class Vehicles than they would have paid had the Defect been timely disclosed.

---

[21] https://www.cars.com/articles/what-affects-my-cars-value-1420680457955/ (last accessed June 1, 2025) (noting reliability can impact a car's value).

106.    Because the existence of the Defect in the Class Vehicles would have been patently material to a reasonable consumer, Plaintiff and the Class would not have purchased or leased the Class Vehicles and/or would not have paid as much for them were the Defect not concealed.

107.    GM's concealment caused Plaintiff and the Class to pay more for the Class Vehicles than they otherwise would have, or to purchase or lease the Class Vehicles when they otherwise would have chosen not to. Stated differently, absent GM's misconduct, Plaintiff and the Class would only have been willing to pay less for the Class Vehicles, if they were willing to purchase or lease them at all.

108.    By concealing and not disclosing the Defect, GM distorted the true value of every Class Vehicle such that every Plaintiff and Class member received a vehicle of different and substantially lesser value—one with a higher effective cost—than they reasonably believed they were receiving.

109.    Stated differently, Plaintiff and the Class surrendered more and acquired less in their transactions than they would have if Defendant had disclosed the Defect. Accordingly, Plaintiff and the Class did not realize the benefit of the bargain in purchasing and leasing the Class Vehicles, and their expectations as ordinary reasonable consumers were not met.

110.    In effect, Plaintiff and the Class paid substantially more than the market value represented by the price bargained for, as Plaintiff and the Class bargained on a particular market value for their respective Class Vehicles. Because the GM's misconduct resulted in Plaintiff receiving less than he bargained for, Plaintiff and the Class effectively paid a higher price than that reflected in the market price.

111.    The cost of every Class Vehicle would have been lower absent GM's concealment of the Defect and its related misconduct, and Plaintiff and the Class detrimentally altered their

positions and suffered damages in an amount no less than the difference in value between what Plaintiff and the Class reasonably believed they were paying for and the value of the Class Vehicle they actually received.

112.    In addition to the monetary harms they have suffered, Plaintiff and the Class Members have been deprived of their peace of mind because of the constant fear of being victimized by car theft.

## V.    TOLLING OF THE STATUTE OF LIMITATION

**A.    The Statute of Limitations Did Not Begin to Run Because Class Members Did Not Discover and Could Not Discover Their Claims Based on Defect**

113.    Plaintiff and the Class had no knowledge of GM's misconduct, including the omissions and concealment alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein.

114.    Plaintiff and the Class did not discover, and could not discover, through the exercise of reasonable diligence, the fact that GM had manufactured and/or sold the Class Vehicles with the concealed Defect.

115.    The limited, though probative, disclosures and revelations alleged in this Complaint required extensive investigation by counsel who suspected, and then became aware of, the Defect.

116.    Ordinary consumers do not have detailed knowledge of vehicle systems and components, although they are justified in expecting their vehicles to be free of substantial defects like the Defect at issue in this action.

117.    GM maintains exclusive control over its proprietary design materials and other technical information that would have revealed the existence and nature of the Defect and the ways in which it manifests when operating a Class Vehicle. Plaintiff and the Class had no access to those

materials or to any substitute that ordinary diligence would have revealed and, as a result, they could not reasonably have been expected to discover the Defect.

118.    No information in the public domain at the time of their purchases or leases by Plaintiff and the Class sufficed to reveal GM's misconduct earlier, including its omissions and concealment of the Defect, or the Defect itself.

119.    Accordingly, the statute of limitations did not begin to run because Plaintiff and the Class did not discover and could not discover their claims, or, in the alternative, because fraudulent concealment tolled the statute of limitations.

120.    GM concealed the Defect and has continued to do so up through the date this action was filed. It did and does so to create the false impression in the minds of Plaintiff and the Class that the Class Vehicles were merchantable and that their component parts, including the key fobs technology, were able to perform their intended function safely and reliably.

121.    Plaintiff and the Class were justified in not bringing the claims earlier based on GM failure to inform Plaintiff and the Class of the existence, nature, extent, and scope of the Defect or its manifestations in Class Vehicles. For the foregoing reasons, the claims asserted in this action accrued much later than the time Plaintiff and the Class purchased and leased their Class Vehicles, and this action is timely.

**B.    Fraudulent Concealment Tolled the Statute of Limitations.**

122.    In the alternative, and based upon the same facts alleged above, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted here.

123.    Plaintiff and members of the Class were unaware of the Defect and GM's misconduct when they purchased or leased their Class Vehicles. GM's affirmative acts and omissions alleged herein were wrongfully concealed and carried out in a manner that precluded

detection of both the acts and omissions themselves, and the existence, nature, extent, and scope of the Defect and its manifestations in Class Vehicles.

124.    By its very nature, GM's misconduct was inherently self-concealing. Vehicle systems and components are subject to regulations and other laws governing their safety and merchantability.

125.    Competing car manufacturers whose vehicles are similarly defective addressed the defect and offered remedies to injured consumers.

126.    Plaintiff and members of the Class reasonably expected the Class Vehicles, including their systems and components, to meet or exceeded such standards.

127.    Accordingly, a reasonable person under the circumstances would have no cause to investigate the legitimacy of GM's conduct before or after purchasing or leasing a Class Vehicle and would have faced extreme difficulty in discerning the Defect that they had no reason to suspect in the first place.

128.    Because the misconduct was both self-concealing and affirmatively concealed by GM, Plaintiff and members of the Class had no knowledge of the misconduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether misconduct existed until counsel revealed the Defect to Plaintiff based upon extensive and also recent investigation.

129.    For these reasons, the statute of limitations as to Plaintiff and the Class's claims did not begin to run and has been tolled with respect to the claims that Plaintiff alleges in this Complaint and any others that might relate to it.

130.    Further, the statute of limitations was tolled as a result of GM's purposeful nondisclosure and other misconduct alleged herein, under the fraudulent concealment doctrine.

## VI.    CLASS ACTION ALLEGATIONS

131.    Plaintiff seeks to certify a Texas Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as:

> All persons within the State of Texas who (a) purchased and/or (b) lease or leased, at least one Class Vehicle.

132.    Unless otherwise stated, the terms "Class" and "Class Members" refer jointly and severally to the proposed Texas Class.

133.    Excluded from the Class are former owners who completed their ownership without experiencing the alleged Defect. Also, excluded from the Class are GM, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Class definitions based on discovery and further investigation.

134.    **Numerosity**. In 2023, Chevrolet was ranked as the third top selling automobile company in the United States.[22] In 2023 alone, Chevrolet sold 1,699,244 vehicles.[23] Chevrolet has approximately 2,883 dealerships in all fifty states, as well as three U.S. territories.[24] The state and territory with the most number of Chevrolet locations in the US is Texas, with 225 dealerships, which is about 8% of all Chevrolet dealerships in the US.[25]

135.    The following chart is a breakdown of the approximate 2024 annual sales figures for some of the Class Vehicles:

---

[22]https://www.best-selling-cars.com/usa/2023-full-year-usa-gm-chevrolet-gmc-cadillac-buick-car-sales-by-model/#google_vignette (last accessed June 1, 2025); https://gmauthority.com/blog/2024/02/usa-chevrolet-sales-numbers-figures-results-fourth-quarter-2023-q4/#:~:text=During%20the%202023%20calendar%20year,13%20percent%20to%201%2C716%2C280%20units. (last accessed June 1, 2025).
[23] *Id*.
[24] https://www.scrapehero.com/location-reports/Chevrolet-USA/#:~:text=There%20are%202%2C899%20Chevrolet%20dealerships (last accessed June 1, 2025).
[25] *Id*.

| **Chevrolet** | | |
|---|---|---|
| | Tahoe | 105,148 |
| | Silverado | 560,265 |
| | Suburban | 44,400 |
| **GMC** | | |
| | Yukon | 87,402 |
| | Sierra | 298,698 |
| | Yukon XL | |
| **Cadillac** | | |
| | Escalade | 41,001 |

136.    Therefore, upon information and belief, the Class is comprised of a sufficiently large group of individuals—believed to be in the tens of thousands, if not more—and thus is so large that it is impracticable to join all members of the Class before the Court as individual plaintiffs.

137.    **Typicality.** Plaintiff is a member of their respective Classes because Plaintiff—like all other Class Members—purchased or leased a Class Vehicle designed, manufactured, marketed, distributed, sold, and/or leased by GM with the identical Theft Prone Defect.

138.    Plaintiff and each member of the Class received less than the full value of the Class Vehicles due to the Defect and Defendant's uniform omissions and concealment of the Defect. Class members, as ordinary reasonable consumers like Plaintiff, would not have purchased the Class Vehicles or paid as much to own or lease them had GM not concealed the Defect, which was unknown to Plaintiff and the Class alike. Thus, Plaintiff and the Class have all been damaged by GM's pattern of misconduct—which is common to all Class members—and have suffered the same economic harms. In other words, GM's misconduct is common to all Class Members and constitutes a shared factual nexus of injury to the Class.

139.    Plaintiff and the Class were exposed to the same or substantially similar material omissions regarding the security and merchantability of the Class Vehicles; as ordinary consumers,

all shared reasonable and foreseeable expectations regarding the safety and merchantability of the Class Vehicles; and all were harmed by the same omissions—namely, GM's concealment of the Defect.

140.    Plaintiff and each Class Member suffered economic damages that are calculable on a class-wide basis. The claims all arise from a single course of conduct and each Class member would therefore individually bring substantively identical legal and factual arguments to establish GM's liability for its misconduct.

141.    There are no defenses available that are unique to the Plaintiff.

142.    **Commonality & Predominance**. The Class is united by a community of interest in obtaining appropriate remedies, including injunctive relief, repair or replacement of the defective vehicles, restitution, damages, and other available relief designed to redress GM's wrongful conduct. This action involves questions of law and fact that are common to the Class that are susceptible to common answers and that predominate over any individual questions specific to any Class Member. These include, but are not limited to the following:

a.    Whether the Class Vehicles contain the Defect;

b.    Whether the Defect constitutes a material fact to an ordinary reasonable consumer;

c.    Whether an ordinary reasonable consumer would have purchased or leased a Class Vehicle had the Defect been disclosed;

d.    Whether an ordinary reasonable consumer would have paid less money to purchase or lease a Class Vehicle had they known of the Defect—and if so, how much less they would have paid;

e.    Whether the Class Vehicles commanded a premium relative to their actual value in light of the undisclosed Defect;

f.    Whether and when GM had actual or constructive knowledge of the Defect;

g.    Whether GM had and has a duty to disclose the Defect to the Class and whether it fraudulently concealed the Defect;

h.    Whether Defendant breached any or all applicable warranties with respect to the Class Vehicles;

i.    Whether GM breached other duties or violated other applicable laws by omission, including concealment of the Defect;

j.    Whether GM breached obligations to provide timely repairs for the Class Vehicles;

k.    Whether and to what extent GM is liable for damages, restitution, diminution in value, out-of-pocket expenses, and other losses incurred by the Class as a result of the Defect;

l.    Whether GM should be declared legally and financially responsible for notifying the Class of the Defect and of their right to whatever relief to which the Class is entitled; and

m.    Whether and to what extent other equitable or injunctive relief is appropriate to remedy the harms caused by GM's misconduct and to prevent further such harms.

143.    These common issues will drive the resolution of the litigation in that their determination will resolve in one stroke issues that are central to the validity of each Class Member's claims.

144.    The factual and legal issues identified above:

a.    Remain common to the Class;

b.    Arise from a common course of conduct and systemic policy decisions made by Defendant;

c.    Predominate in number and importance over questions that may not be common to the class; and

d.    Preclude neither class-wide calculation of damages nor the methodological determination of how such damages should be allocated among Class members.

145.    **Adequacy of Representation**. Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members. Plaintiff commit to protecting the interests of the Class without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class generally.

146.     Plaintiff has retained attorneys with exceptional experience in complex litigation, including extensive class action experience and experience in handling consumer protection cases and product liability cases, including automobile defect claims. The firms and lead counsel for the firms retained by Plaintiff also has substantial trial experience, individually and collectively. Plaintiff and his attorneys will responsibly, ethically, and vigorously advocate on behalf of the Class, and Plaintiff's counsel have ample resources to do so.

147.     **Superiority**. This class action is superior to the other means available to the Class to obtain relief because:

a.     The damages suffered by individual Class Members are relatively small compared to the burden and expense of individual litigation of the claims described here against GM so that making the Class whole in the absence of a class action is unlikely and impracticable;

b.     Class Members accordingly have relatively less interest in individually controlling the prosecution of separate actions (if they even are aware of the issue); and it cannot be said that the interests of individuals pursuing individual cases in conducting separate lawsuits is so strong as to call for denial of a class action; and

c.     Denial of class treatment runs the risk of establishing incompatible standards of conduct for GM, discouraging the prosecution of meritorious but relatively small claims, and it may result in adjudications which would be dispositive of the interests of other Class Members who are not parties to the adjudication, or otherwise substantially impair the ability of Class Members (and GM) to protect their rights and interests.

148.     GM has no facially plausible interest in defending against separate, geographically dispersed claims and, in fact, that would be more burdensome to GM than defending against all potential claims in a single forum and proceeding.

149.     Likewise, the judicial system has no interest in burdening a number of courts when the claims of a cohesive class can be fairly and efficiently concentrated and managed by this Court.

150.     The claims are indeed manageable because they are governed by one state's law.

151.     Further, the class procedure is designed to result in the fair, uniform, and efficient adjudication of the sorts of claims presented by this Complaint.

152.     GM's misconduct impacts all Class Members, whose losses are capable of calculation on a Class-wide basis.

153.     **Injunctive and Declaratory Relief**. GM has acted or refused to act on grounds generally applicable to the Class, making the award of equitable relief and/or restitution appropriate to the Class in its entirety.

154.     Certification of particular issues would move the litigation forward efficiently and would save money, time, and judicial resources for all involved, regardless of whether the action as a whole might be certified.

## VII.    CAUSES OF ACTION

**COUNT 1: VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT –
CONSUMER PROTECTION ACT
(Tex. Bus. & Com. Code §§ 17.41, *et seq.*)
(By Plaintiff on behalf of the Texas Class)**

155.     Plaintiff and the Class incorporate by reference paragraphs 1-154 as though fully set forth at length herein.

156.     Plaintiff and the Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* TEX. BUS. & COM. CODE § 17.41, and are therefore "consumers," pursuant to Texas Business and Commercial Code § 17.45(4). GM is a "person" within the meaning of Texas Business and Commercial Code § 17.45(3).

157.     GM is engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Texas Business and Commercial Code § 17.46(a).

158.    The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," TEX. BUS. & COM. CODE § 17.46(a), and an "unconscionable action or course of action," which means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE §§ 17.45(5) and 17.50(a)(3).

159.    In the course of their business, GM knew that the Class Vehicles' keyless entry systems were defectively designed or manufactured, were susceptible to cloning and theft, and were not suitable for their intended use. Many owners and lessees of Class Vehicles have communicated with GM to request that GM remedy and/or address the Defect and/or resultant damage at no expense.

160.    GM receives and maintains consumer complaints regarding the Defect. GM maintains these complaints and inventory records in its centralized system. Despite its longstanding knowledge of this defect, GM has routinely refused to repair the Class Vehicles without charge when the defect manifests.

161.    Yet GM concealed and suppressed material facts concerning the Class Vehicles, the Defect, and its propensity for the Class Vehicles to be stolen. GM accomplished this by denying the existence of the Defect.

162.    GM thus violated the Texas DTPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

163.    GM engaged in misleading, false, unfair, and deceptive acts or practices that violated the Texas DTPA by failing to disclose and actively concealing the nature of the Defect.

164.    GM owed Plaintiff and the Class members a duty to disclose the existence of the Defect because:

a.    The exclusive and reliable operation and functionality of the Class Vehicles' key fob is central to the secure and reliable function of the Class Vehicles as a whole, including preventing and deterring thieves;

b.    Defendant was in a superior position to know that the Defect existed as the designers, manufacturers, assemblers, distributors, marketers, and warrantors of the Class Vehicles, and GM remains in that position as to the vast majority of unwitting Class Members;

c.    Plaintiff and the Class were not involved in the design or manufacture of the Class Vehicles, and as such could not be expected to learn or know about the existence and cause of the Defect;

d.    GM knew that Plaintiff Cho and the Subclass lacked access to the design and manufacturing materials necessary to understand the existence and cause of the Defect; and,

e.    GM knew that ordinary reasonable consumers would expect the Class Vehicles to be free of significant defects central to the security and safety of the vehicles such that the Defect would constitute a material fact in any purchasing or leasing decision, i.e., it would have influenced any and every reasonable consumer's purchasing or leasing decision, including whether and how much to pay to purchase or lease a vehicle.

165.    Ordinary reasonable consumers have no general appreciation of the components and subcomponents of vehicles and vehicle systems but would expect the vehicle to be well-designed and to offer a reasonable level of safety and reliability when used as intended.

166.    Every ordinary and objectively reasonable consumer would expect the Class Vehicles to be free of significant defects central to the security of the vehicles and thus implicitly and necessarily would hold such an expectation as to the ignition system and its component parts.

167.    The exclusive, reliable, and proper functioning of the key fob is a material component of a vehicle transaction because it is required to prevent thieves from easily stealing the Class Vehicles. Accordingly, every ordinary and objectively reasonable consumer would have considered the Defect to be an important and material fact that would have substantially influenced their decision of whether to purchase or lease a Class Vehicle and how much to pay, if anything.

168.    Every ordinary and objectively reasonable consumer acting reasonably under the circumstances would have been deceived by Defendant's misconduct, including its concealment of the Defect.

169.    As a direct, foreseeable, and proximate result of GM's deceptive practices, Plaintiff and every member of the Class:

a.    Purchased or leased a Class Vehicle they otherwise would not have purchased or leased or paid more than they otherwise would have;

b.    Thereby suffered an ascertainable loss of money, property, and value of the Class Vehicles; and

c.    Suffered actual damages and other economic harms because of the latent Defect, including the losses described elsewhere in this Complaint.

170.    Due to GM's original and continuing misconduct alleged throughout this Complaint, Plaintiff and the California Subclass are entitled, pursuant to the DTPA, to injunctive, declaratory, and equitable relief, including an order, judgment, and other judicial action, decision, or proclamation:

a.    Declaring that the Class Vehicles' key fob systems as defective or absent;

b.    Declaring that GM's conduct violated the DTPA;

c.    Declaring that Plaintiff and the Class are entitled to reimbursement or restitution for money spent on the Class Vehicles; and

d.    Enjoining GM from continuing to violate the DTPA.

- 36 -

171. GM's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the safety and reliability of the Class Vehicles.

172. Plaintiff and the Class suffered ascertainable loss and actual damages as a direct and proximate result of GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated or would have paid significantly less for them. Plaintiff also suffered diminished value of his vehicles, as well as lost or diminished use.

173. The omissions and acts of concealment by GM pertained to information that was material to Plaintiff and the Class members, as it would have been to all reasonable consumers.

174. GM had an ongoing duty to all GM customers to refrain from unfair and deceptive practices under the Texas DTPA in the course of its business.

175. GM's violations present a continuing risk to Plaintiff as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

176. Plaintiff notified GM of its violations of the Texas DTPA, and/or they were not required to do so because affording GM a reasonable opportunity to cure its violations would have been futile. GM also knew about the Defect but chose to conceal it in further violation of the Texas DTPA.

177. Pursuant to Texas Business and Commercial Code § 17.50, Plaintiff, and the Class seek an order enjoining GM's unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

178.     GM has been provided notice of these issues by numerous complaints, as alleged

herein.

### COUNT 2: BREACH OF IMPLIED WARRANTY
### (Tex. Bus. & Com. Code § 2.314)
### (By Plaintiff on behalf of the Texas Class)

179.     Plaintiff and the Class incorporate by reference paragraphs 1-154 as though fully

set forth at length herein.

180.     GM is and was at all relevant times a "merchant" with respect to motor vehicles

under Texas Business and Commercial Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of

motor vehicles under § 2.103(a)(4).

181.     With respect to leases, GM is and was at all relevant times a "lessor" of motor

vehicles under Texas Business and Commercial Code § 2A.103(a)(16).

182.     The Class Vehicles are and were at all relevant times "goods" within the meaning

of Texas Business and Commercial Code §§ 2.105(a) and 2A.103(a)(8).

183.     A warranty that the Class Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law, pursuant to Texas Business and

Commercial Code §§ 2.314 and 2A.212.

184.     GM impliedly warranted that the Class Vehicles, including the key fobs and

security system, were of merchantable quality and fit for such use. This implied warranty included,

*inter alia*, the following: (i) a warranty that the Class Vehicles were manufactured, supplied,

distributed, and/or sold by GM were safe and secure for transportation, storage and parking; and

(ii) a warranty that the Class Vehicles would be fit for their intended use—providing safe and

reliable security—while the Class Vehicles were being unoperated.

185.    GM breached the implied warranty of merchantability in that the defective Class Vehicles were not in merchantable condition when they were sold to Plaintiff and Class members and said vehicles were and are unfit for the ordinary purposes for which such vehicle is used because they pose a serious safety risk to the occupants and are an unreliable means of transportation, storage and parking.

186.    GM has been provided notice of these issues by numerous complaints, as alleged herein. Many owners and lessees of Class Vehicles have communicated with GM's Customer Experience Center to request that GM remedy and/or address the Defect and/or resultant damage at no expense.

187.    GM maintains these complaints and inventory records in its centralized system. Despite its longstanding knowledge of this defect, GM has routinely refused to repair the Class Vehicles without charge when the defect manifests.

188.    As a direct and proximate result of breaches of the implied warranty of merchantability, Plaintiff and the Class members have suffered damages, including but not limited to incidental and consequential damages.

### COUNT 3: BREACH OF EXPRESS WARRANTY
### (Tex. Bus. & Com. Code § 2.313)
### (By Plaintiff on behalf of the Texas Class)

189.    Plaintiff and the Class incorporate by reference paragraphs 1-154 as though fully set forth at length herein.

190.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Business and Commercial Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

191.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Business and Commercial Code § 2A.103(a)(16).

192.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Business and Commercial Code §§ 2.105(a) and 2A.103(a)(8).

193.    In connection with the sale of the defective Class Vehicles to the Plaintiff and the Class, GM provided new vehicle warranties, under which it agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the engine and its components.

194.    GM's express warranties were part of the basis of the bargain respecting the purchase and/or lease of the defective Class Vehicles. In addition to written warranties, GM warranted several attributes, characteristics, and qualities of the subject vehicles, as alleged above.

195.    GM distributed the defective parts causing the Defect in the Class Vehicles, and said parts are covered by GM's warranties granted to all purchasers and lessees of the Class Vehicles.

196.    GM breached these warranties by selling and leasing Class Vehicles with the Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

197.    Plaintiff notified GM of its breach within a reasonable time, and/or they were not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. GM also knew about the but chose to conceal it as a means of avoiding compliance with its warranty obligations.

198.    Many owners and lessees of Class Vehicles have communicated with GM to request that GM remedy and/or address the Defect and/or resultant damage at no expense.

199.    GM maintains these complaints and inventory records in its centralized system. Despite its longstanding knowledge of this defect, GM has routinely refused to repair the Class Vehicles without charge when the defect manifests.

200.    In fact, GM routinely instructs its GM Dealerships around the United States to deny a request for repair of the Defect. These communications and directives are sent to GM dealerships in all 51 jurisdictions implicated in this suit. GM has failed and/or refused to do so— often conveying to Vehicle owners that the failed parts comprising the Defect are considered "maintenance" and/or "wear" items and are therefore not covered under warranty.

201.    Plaintiff submitted his vehicles for warranty repairs as referenced herein. GM failed to comply with the terms of the express written warranty provided to Plaintiff, by failing and/or refusing to repair the Defect under the vehicle's warranty as described herein.

202.    Plaintiff has given GM a reasonable opportunity to cure the Defect, but GM has been unable and/or has refused to do so within a reasonable time.

203.    As a result of said nonconformities, Plaintiff cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, comfortable, and efficient transportation.

204.    Plaintiff could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiff's acceptance of the subject vehicle.

205.    Plaintiff would not have purchased the subject vehicle(s), or would have paid less for the subject vehicle(s), had he known, prior to her respective time of purchase or lease, that the subject vehicle contained the Defect.

206.     As a direct and proximate result of the willful failure of GM to comply with their obligations under the express warranties, Plaintiff and the Class members have suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein.

207.     As a direct and proximate cause of GM's breach, Plaintiff and the Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles.

208.     Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice to Plaintiff or the Class members.

209.     The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Plaintiff and the Class members. Among other things, Plaintiff and the Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Plaintiff and the Class members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

210.     Plaintiff and the Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

211.     Also, as alleged in more detail herein, at the time that GM warranted and sold the vehicles, it knew that the vehicles did not conform to the warranties and were inherently defective, and GM wrongfully and fraudulently misrepresented and/or concealed material facts regarding

their vehicles. Plaintiff and the Class members were therefore induced to purchase the defective

Class Vehicles under false and/or fraudulent pretenses.

212.    GM has been provided notice of these issues by numerous complaints as described

herein.

213.    As a direct and proximate result of GM's breach of express warranties, Plaintiff

and the Class members have been damaged in an amount to be determined at trial.

## COUNT 4: FRAUD BY CONCEALMENT
### (Based on Texas Law)
### (By Plaintiff on behalf of the Texas Class)

214.    Plaintiff and the Class incorporate by reference paragraphs 1-154 as though fully

set forth at length herein.

215.    GM made material omissions concerning a presently existing or past fact in that,

for example, GM did not fully and truthfully disclose to its customers the true nature of the Defect

which was not readily discoverable by them until many years after purchase or lease of the Class

Vehicles. These facts, and other facts as set forth above, were material because reasonable people

attach importance to their existence or nonexistence in deciding which vehicle to purchase.

216.    GM was under a duty to disclose these omitted facts, because where one does

speak one must speak the whole truth and not conceal any facts which materially qualify those

facts stated. One who volunteers information must be truthful, and the telling of a half-truth

calculated to deceive is fraud.

217.    In addition, GM had a duty to disclose these omitted material facts because they

were known and/or accessible only to GM who had superior knowledge and access to the facts,

and GM knew they were not known to or reasonably discoverable by Plaintiff and the Class

members. These omitted facts were material because they directly impact the safety of the Class Vehicles.

218.    GM receives and maintains consumer complaints regarding the Defect. GM maintains these complaints and inventory records in its centralized system. Despite its longstanding knowledge of this defect, GM has routinely refused to repair the Class Vehicles without charge when the defect manifests.

219.    In fact, GM routinely instructs its GM Dealerships around the United States to deny a request for repair of the Defect. These communications and directives are sent from its headquarters to GM dealerships in all 51 jurisdictions implicated in this suit. GM has failed and/or refused to do so—often conveying to Vehicle owners that the failed parts comprising the Defect are considered "maintenance" and/or "wear" items and are therefore not covered under warranty.

220.    GM was in exclusive control of the material facts and such facts were not known to the public or the Class members. GM also possessed exclusive knowledge of the defects rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

221.    GM actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

222.    Plaintiff and the Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the Class members were justified.

223.    Plaintiff and the Class members reasonably relied on these omissions and suffered damages as a result.

224.    As a result of the concealment and/or suppression of the facts, Plaintiff and the Class members sustained damage. For those Class members who elect to affirm the sale, these damages include the difference between the actual value of that which Plaintiff and the Class members paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those who want to rescind the purchase, they are entitled to restitution and consequential damages. GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights and well-being of Plaintiff and the Class members in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT 5: MONEY HAD AND RECEIVED/UNJUST ENRICHMENT (IN THE ALTERNATIVE)
### (Based on Texas law)
### (By Plaintiff on behalf of the Texas Class)

225.    Plaintiff and the Class incorporate by paragraphs 1-154 as though fully set forth at length herein.

226.    Plaintiff brings this cause of action on behalf of himself and the Class.

227.    As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the defect, GM charged a higher price for their vehicles than the vehicles' true value and GM obtained monies which rightfully belong to Plaintiff and the Class members.

228.    GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Class members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM to retain these wrongfully obtained profits.

229.    Plaintiff, therefore, seeks an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

## VIII.   JURY DEMAND

230.    Plaintiff, on behalf of himself and the putative Class, hereby demands a trial by jury on all issues so triable.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, respectfully request that this Court:

a.    determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

b.    appoint Plaintiff as the representative of the Class and their counsel as Class counsel;

c.    award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and members of the Class are entitled;

d.    award pre-judgment and post-judgment interest on any monetary relief;

e.    grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires GM to repair, recall, and/or replace the Class vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class members with appropriate curative notice regarding the existence and cause of the Door Actuator Defect;

f.    award reasonable attorneys' fees and costs; and

g.    grant such further relief that this Court deems appropriate.

Dated: June 2, 2025.

Respectfully submitted,

By: */s/ Bruce W. Steckler*
Bruce W. Steckler
Austin P. Smith
Paul D. Stickney
**STECKLER WAYNE & LOVE PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
bruce@stecklerlaw.com
austin@stecklerlaw.com
judgestick@gmail.com

Monica Goff
**CARTER ARNETT PLLC**
8150 N. Central Expressway, Suite 500
Dallas, Texas 75206
Telephone: (214) 550-8188
Facsimile: (214) 550-8185
mgoff@carterarnett.com

Timothy Micah Dortch
State Bar No. 24044981
Email: Micah@dll-law.com
**DORTCH LINDSTROM LIVINGSTON
LAW GROUP**
2613 Dallas Parkway, Suite 220
Plano, Texas 75093
Telephone: (214) 393-1212
Facsimile: (888) 653-3299

**ATTORNEYS FOR PLAINTIFF AND
THE CLASS**